Court will proceed to the sixth case, Ismail v. Brennan. Ms. Major. May it please the Court? Good morning. We have raised issues in this case that can be grouped into four categories. The first category is whether, in a case where there's testimony concerning disciplinary events that is heavily disputed, in such a situation, whether the intent of the decision-maker should be determined by a jury as opposed to being determined by a court as a matter of law. The second issue is whether the district court erred by not deferring the issue of whether the comparators were treated as equal. The third issue that we'll be addressing is whether or not the district court erred by making a finding as to whether plaintiff was meeting the legitimate expectations of defendant under McDonnell-Douglas when defendant had not raised that as an issue in its motion for summary judgment. And the last issue is whether or not the district court erred by not recognizing an EEO charge that plaintiff had filed in June of 2012 when analyzing the retaliation issue. Those are the four issues. As to the first issue, I'm not going to get into a lot of the facts because I know you have the briefs, but Mr. Ismail has been a postal carrier for many years. And several years ago, he had ongoing concerns with the district court about whether or not the plaintiff should be dismissed from the post office. He was dismissed on summary judgment. And since that time, Mr. Kaiser has consistently treated Mr. Ismail different than everyone else working in the post office, either ignoring him or belittling him or berating him for things. He's never ever had a positive relationship or a normal relationship with Mr. Kaiser since that initial lawsuit. He never did anything about it through those years because it was not full-blown problems. It was just coming to work and knowing you're not going to be treated like everyone else. And he kind of kept his head down and did his work. On December 10th of 2010, things changed a little, actually quite a bit. And we went through the series in the span of just a couple of hours, Mr. Ismail was confronted repeatedly by Ralph Kaiser. And it supposedly was started by him being questioned about whether he'd be late with his mail. And that's not even something, it's such a routine thing. If there's inclement weather, if a postal carrier sees his volume, thinks he may have trouble, they submit a form. It's a non-issue. It's never addressed with management. That day it was addressed by a supervisor who then, though she testified she always handles issues on her own, somehow Ralph Kaiser got involved. He confronted my client in his work area. Are you going to be late? I don't think so. He's like, I don't know, I don't think so. And I'll put in a form if I have concerns. Then he confronted him in the parking lot again, very aggressive. Are you going to be late? What's going on? And then my client was like, I don't know, I don't expect to be late. You can watch me. He didn't know what to say. Then Ralph Kaiser does go out, and he said he's never done this, he goes out and watches my client delivering mail. And gets out of his vehicle and starts giving my client orders, don't walk there, don't walk there, do this, inconsistent orders. My client would start doing this, and then he'd say do that. And it was just very aggressive. And at one point he told my client to walk in the street, which is not a thing that the mail carriers are told to do by management. In fact, my client said there were cars in the street, and he wasn't going to go walk in the street, and it's not expected to. The post office does not expect people to follow directives that would put them in danger. All of this evidence of this event, everything that led up to his decision, my client actually ended up calling the police he was so concerned. Ralph Kaiser went within five inches of his face and was pointing at him and yelling at him. All of this preceded Mr. Kaiser's decision to issue discipline to my client. And he says I issued the discipline for legitimate reasons, because he didn't want to go to jail. He didn't follow a directive, and there was a safety issue. Our position is that with all this evidence surrounding this event, all this hostility, this anger, this history of treating him different from the time he filed his complaint years ago where Mr. Kaiser told him he was going to send him back to his country, that evidence could have led a jury to say, you know what, Kaiser, we don't believe you. We don't believe that you did this for the good reason. We don't believe that you harassed him for hours, gave him inconsistent orders, got into his face yelling at him, and then all of a sudden you broke away from that and had a moment of legitimacy. And we think that's something that a jury should decide. They should hear all that evidence, and they should decide whether or not it was legitimate or it wasn't legitimate. And what would all of that get to? I know the post office has a lot of, we'll call it grievances and appeals and this kind of thing, and it all sums up, you know, he got the pay that he missed, etc. It sounds like he was not happy, but what would be the end result of what you hope was a jury trial? The end result of what would we get if we were to prevail? He gets attorney's fees, he gets damages for pain and suffering that he experienced from these events. There could be some injunctive relief to the post office that they have to do things differently. They can't allow these things to go on. It went on and on and on and on. It went on and on. And nobody really did anything to stop this. Ms. Major, does the record reflect the size of this postal unit? I mean, the number of people? You know, it doesn't. It doesn't. I don't know. It seems relatively small, but I'm not sure how many employees there are. I'm sorry. So, you know, one of the other events, there was a threat made by a co-worker. My client reported to his supervisor, and even though Mr. Kaiser doesn't normally get involved in disciplinary matters, he took control of this, and he sent my client home. On another, the third incident that we addressed in this case, he accused my client was put out on a suspension for the incident where he supposedly got in a dispute with a co-worker. The very day he came back, Ralph Kaiser confronted him and said that he claimed he'd said hello three times, was humiliating him, making him read the section on courtesy, and then said that my client accused him or threatened to kill him. The police didn't bring any charges. They didn't believe it. The post office returned him back to work the next day. They obviously didn't believe it, because if they thought he was threatening to kill the postmaster, he wouldn't be coming back to work for anything. With my client, it went on and on, and to understand or to determine somebody's intent or party's intent, you can't look at what they say about one part, one slice of an event, and disregard all the other facts. You have to look at the whole thing. We also presented evidence of comparators, people who had done, really, my client was accused of walking on snow. We presented evidence of people that got in car accidents for violating, and one got in an accident, left, and lied about it. We presented evidence of another woman who came to work intoxicated. These people didn't get the discipline that my client got. That's evidence under Coleman of my client being discriminated against and not being treated like his colleagues under McFarland Douglas. The reality of this case is, we have two people who absolutely did not get along, and an employee who had been harassed found a way to get under his supervisor's skin repeatedly. Let's start at the beginning. I'd rather jump to his comparables and how some of the behavior of some of these other individuals employed by the post office were much more severe than what Kaiser is accusing Ishmael of, and the reprimand or the discipline was pretty much negligible when you look at his behavior. I'd be happy to address those. There are three comparables at issue. Dana Hall, Donald Daly, and Ray Adam. Those are the only three at issue. Dana Hall, by far, had the most serious incidents with regard to showing up to work apparently intoxicated. That happened on two occasions. The first one, Ralph Kaiser wasn't even present for. The people who were present for that incident were Dawn Ellison and the supervisor was Dennis Arneson. It happens that the two of those supervisors knew about the general issues with Dana Hall from her conduct and were trying to work with her on what apparently was a substance abuse problem. So then this decision to send her home for a day and not to discipline her was a decision that was not seconded by Kaiser or approved by Kaiser? He wasn't even there for the first instance. Right. So to the extent that Kaiser is at the top of the food chain, he did review, didn't he, what happened with Hall, that Hall was sent home for a day. He chose not to do anything else in terms of discipline? She was given discipline for unauthorized leave without pay. Frankly, that's the same thing that happened to Ishmael when he was sent home on December 10 for continuing to disobey Kaiser's instructions. There's a huge, gigantic difference between these two incidents. Dana Hall, to the extent that she had an alcohol problem, can't be said to have had the intentionality of conduct that Ishmael displayed with Kaiser and Ellison on December 10. This is a woman who apparently had a substance abuse problem. They were trying to deal with it, Ellison and Arneson. And they were trying to be sensitive to the fact that they regarded, because of their own personal experiences with substance abuse and their own families with friends, they were trying to deal with it as they understood it as a disease in many people. On the other hand, you've got Ishmael, who is out on the street and he sees Kaiser, and he's going to walk, he's going to get on the top of a snow pile of ice and debris that a snow plow has pushed onto the ground. And he gets up on it and he walks on it like he's walking in a tightrope. And it's not just one person that saw it, it's not just Kaiser saying this, you've got Don Ellison saying it, and then he calls the police to complain that he's being instructed, and it's in the police report, he's complaining about the instructions he's getting from his boss. Because the police and the police see the same thing. And then when Postmaster Kaiser says, hey, quit walking on that snow, if you need to walk on a firm surface, if you can't cross the lines, walk on the street where it's clear. Now, look, I'm not saying that you might not prevail at trial on this, but I'm just, there are a lot of factual disputes about this and how that all went down. And then you have the other person who had the car accident, who, I mean, who had the accident, and I think got, what, 14 days? I'm trying to find that in my notes. That's right, Your Honor. Compared to what Ishmael got. To me, there's a question of fact here, and I'm concerned about summary judgment being ran. Well, Judge, let me do my best to dispel your concerns. Again, with the other two comparators, a man named Don Daly, who had an accident with a, he knocked off a mirror in an accident with a forklift. There was no intentionality of that kind. And he didn't lie about it either. Did he leave the scene of the accident without notifying his supervisor or cleaning up the broken glass on the roadway? Is that true or not true? It was in a parking lot, and the outcome of the accident was a broken mirror and some debris on the... Right. And then did he leave the scene of that accident without notifying his supervisor? Leave the scene. He packed up and went home, but he did not that day. And then the next day, when he was confronted with that, Your Honor, he admitted that he did it. There's a huge, gigantic difference between somebody standing in front of their supervisor being told, hey, quit walking on that snow. If you need to, walk on the street where it's clear. And the employee saying, no, I'm going to keep doing it. I disagree. I'm not going to obey your instructions. And a guy who gets into a car accident and doesn't report it until afterwards when he's confronted. Yeah, they're both conduct that ought to be reprimanded. But you can't compare somebody who's saying, I'm going to intentionally disobey your order to somebody who, on the other hand, simply doesn't come forward and report an accident. That's just not comparable. And then the last guy who was backing up, and I think this is really hard to deal with, the record is absolutely clear. He was permitted to back up in the location where that accident happened. And yeah, he got into an accident. But again, certainly no intentional conduct there. So you think that that, you think that, see, I think we're talking matters of degrees where a jury could look at Daly's conduct, even though he admitted his involvement, crashing his truck and leaving debris at the scene, compared to Ishmael walking on top of the snow, they may look at it differently than you view it. Judge, if they did, they should never get a chance to look at it in this case. And the reason is, there is a big, gigantic difference. It's not as if Ishmael just made a bad decision to walk on the snow. When he was told to stop it, he refused. He refused the instruction. Absolutely clear on the record. The other employees certainly did not refuse legitimate instructions given by their employers, at least in the case of Dana Hall. Yeah, she kept having a problem, but there was no intentionality. Right, right, right. But she was referred to the Employee Assistance Program, and she was allowed to continue working, and it wasn't until sometimes later that she was issued a letter of removal for attendance issues. So a jury could look at this and say that Hall was treated more favorably than Ishmael, because unlike Ishmael's immediate emergency placement and suspension, Hall was given a chance to rectify her misconduct before she got any punishment. I mean, that's another one that could be looked at differently. Oh, no, I disagree, Your Honor. I mean, he was given a chance right away. He could have simply complied with the directive of his supervisor, but refused to do so. Mr. Lawrenson, could I... Absolutely. It's a snowy day. Obviously, there's a history between Kaiser and Ishmael. Seven years old at this point. Yeah, no, I think we've all gleaned that from the record. It's a snowy day, and this Dawn Ellison... The speed or dispatch with which Ishmael will conduct his deliveries? Yes. Does the record reflect... Was there a suggestion that he had been dilatory? There is that in the record, Your Honor, but the bottom line with that is he's not complaining about Dawn Ellison doing that. No, no, I understand. By the way, can I just correct one misimpression I may have left you with? When I said that there's a seven-year-old history, the event between Kaiser and Ishmael was seven years old, and there's nothing in the record between that event and December 10th. No, I understand. It's not that it's been going on for seven years. It just meant that they had some personal exchange over an extended period of time, and he goes out to deliver his mail. Is the record reflected that a supervisor goes in his personal car to check the speed with which an individual postal carrier goes from house to house? That absolutely happens, and it happens on a regular basis. Had there been complaints about Ishmael from people on the route about his mail delivery and delays or their mail not coming on time? No, that's not the issue with speed of delivery. The issue is overtime pay. If he doesn't deliver the mail on time, the Postal Service incurs overtime pay. Is there a history of him using overtime more than other employees? There was that history, Your Honor. How much of a history? There was nothing firm put in the record, but what is in the record is... That's not in the record, the volume or the amount of money. Tell me what's in the record on that. What is in the record is in that conversation, Kaiser specifically informed Ishmael of what his concern was, that he, Kaiser, the Postal Service, had to pay for the overtime that he incurred. The thing that triggered all this was in the record. Ishmael himself admits that he triggered this reaction from the Postal Service when asked whether or not he was going to be late. He said, well, I don't know. There's snow out there. I might be late. No other postal employees who are all required to predict whether or not they anticipate being late. None of them said anything about being late because of the snow. It was that conversation that triggered Kaiser going out. So let me ask you this. Were there other instances in the record where Kaiser went out on this whole issue of overtime and followed an employee as they delivered? Was Ishmael the only one that ever asked for overtime? I'm just trying to get a sense of the normal practice of Kaiser to follow the mail carriers around Ishmael himself asked him to come out. He said, if you think that I'm not going to do my job right, you can come out and look at me. We don't have anything in the record about any other employees saying that to their supervisor. Given the history that they had, that might have been a reasonable request by Ishmael to invite him to come out, I'm just wondering, is that unusual? Because that's another thing to me that puts this not in the realm that you wouldn't necessarily win at trial before the jury, but the realm of not granting summary judgment. Judge, in that realm, those facts aren't in dispute. And he's not complaining about the fact that Mr. Kaiser went out and looked at him delivering the mail. I understand that. It's the context of everything, though, that we have to put in perspective. The context is, he basically, again, from what I said at the beginning, he says to his supervisor, I don't know if I'm going to be late. No other employee did that. He says to his supervisor, I could be late because of the snow. No other employee said that to their supervisor. And on top of it, he says to his postmaster, if you want to come out and look at me, you're welcome. Come out and look at me. So who started that? The Postal Service postmaster who's got a job to protect the budget and make sure he's not being charged for unauthorized overtime? Or Ishmael, who can't give the same straightforward response as any other employee at the post office? Ishmael started it, Your Honor. And he's not complaining about those things, but he's living with the consequences. But again, the key thing here is, you've got an employee who says to his supervisor, now he's out there. Now Kaiser's out there. And he's supervising his employee. And he sees him walking in the top of snowplow debris. Three people see this. And he tells the guy, stop it. There's no reason for that. If you think that you need to go down to the street, just walk along the edge. This is a residential neighborhood. And many of us live in those neighborhoods. And in this particular neighborhood, the street was directly adjacent to the sidewalk anyway. So he's not asking him to go that far. And he sure as heck doesn't tell him to walk out into traffic. Ishmael's conduct in refusing to follow his supervisor's legitimate instructions after an absence of any activity. Counsel says he didn't do anything about it. Well, basically, if there was something to do about it, you can be rest assured that Mr. Ishmael would have done something about it. They've got a period of inactivity in the battle for like seven years. And on this day, he's insolent to his supervisor, Dawn Ellison, who simply wants to know, you're going to be late. She's the one who involves Kaiser. Kaiser didn't come out to talk to him on the workplace floor by himself or uninitiated. And when he gets out there, Ishmael says, I don't know. It might be late. There's snow on the ground. You want to come out and watch me? Now, unfortunately, Kaiser took the bait. But Ishmael directly refused his instructions. That's why he was put on emergency discipline, unlike the others who he's being compared to, who really had no intentionality in conduct. I think we have the government's position. Thank you, Your Honor. We'd ask that this summary judgment decision of Judge Zagos be affirmed. Thank you. Ms. Major? May it please the Court? Is there some issue about the prima facie case? I'm sorry, what's that? About a prima facie case? Yeah, well, one of the issues is that the defendant only moved for summary judgment based on their claim that my client couldn't establish the third prong of the prima facie case. And then the judge ruled on the first prong of the McDonnell-Douglas, finding that my client hadn't met the legitimate expectations. For the similar reasons of pretext, but it is a different analysis for legitimate expectations. It's more of an objective as opposed to the somewhat subjective. Well, is this going to pretext? Or is this taken out on the initial prima facie case? Well, so what we argued, I mean, the summary judgment only addressed the third prong pretext. And that's what we briefed. The third prong meaning if there's a prima facie case and then the question whether it's a phony reason for firing. Exactly. So the defendant basically did not challenge that we had met the prima facie elements in its motion. That was not in the motion. It wasn't addressed in any of the briefing. And then the court, sua sponte, ruled that that was another basis for summary judgment. And what we put in our appellate brief is that we should have been on notice that that was going to be an issue because you get 15 pages, double-spaced. You can't address every single legal issue and fact that could possibly arise in connection with the case. You have to, you know, the moving party puts you on notice of the issues, you respond. So one of our reasons for asking for this to be returned to the district court is that we didn't, my client was denied due process and not getting a chance to respond to these issues because they were never raised on the motion. So that is one of the arguments. And then just I wanted, if I could, does that answer your question though, Your Honor? Okay. A couple of things I want to go through. One is counsel said that Ms. Hall got the same discipline as my client for the December 10th incident. That's completely inaccurate. My client was taken out of service from December 10th to December 28th for 18 days. Then when it was time for my client to return, Kaiser put him on another two-week suspension. It was a month long that my client was kept out of work without pay. Ms. Hall, who came to work the second time intoxicated, was given no discipline for that. And the personnel record where it shows the referral to the EAP, it is under Kaiser's name. It shows that Kaiser was the person who determined that she would not get discipline. He was involved in that. Yeah, that was the question I had because I thought there was a document that showed that he had to sign off on, right? Sorry. That's exactly right. I'm sorry. That's exactly right, Your Honor. Okay. All right. I'm sorry. No, I apologize. It's hard when I can't see you. Also, I wanted to also address that Kaiser was involved in the other incidents. He took over the second incident from the supervisor even though he claims he allows supervisors to handle it. The testimony, there was no evidence my client had any issues with overtime or being late or any of those. And he was the only person who was approached that morning by Allison. It was very peculiar. And then Allison testified she never gets Kaiser involved in her issues. Why she would talk to him that morning about that and then why she would elevate it to herself and observe the postal carrier. So everything about this. And the important thing to remember too is my client disputes that he didn't follow the directives. He was moving and going here and going there and doing whatever he could do until finally the directive was walk in the street. And that's when it stopped. So I hope that answers the questions. We really appreciate your time. And we just ask that the summary judgment be vacated. Thank you. Thank you, Ms. Major. Thank you, Ms. Lawrenson. Case is taken under advisement.